OPINION OF THE COURT
Benjamin F. Nolan, J.
In 1975, the City of New York was faced with a serious economic and financial crisis. To create a climate which would justify sorely needed Federal aid, the city entered into written agreements with unions representing hundreds of thousands of employees to defer "for one year” various increases covering the period June 30, 1975 through June 30, 1976. In return, the city agreed not to lay off for economy reasons any full-time per-annum employees covered by the agreement for the period commencing September 1, 1975 and ending August 31, 1976. These wage deferral agreements modified existing collective bargaining agreements. One such wage deferral agreement was entered into between the city and plaintiff’s union, effective August 31, 1975. At that time, plaintiff was a court clerk employee of the city and would have been entitled to be paid the deferred wage increases but for the wage deferral agreement. On April 1, 1977, the date of the State take-over of the court system, plaintiff’s service with the city automatically terminated and he became, as he is today, a State employee performing the same court clerk duties he previously performed as a city employee. Under the wage deferral agree *358 ment, however, termination of city employment did not deprive an affected employee of his right to eventual payment of the deferred wage increases. Plaintiff, therefore, brought this action to be paid the deferred wage increases, with interest, contending that the deferral period has long since terminated. The city moves to dismiss the action, contending that it is no longer obligated to pay the deferred wage increases, but that, if this court should find that it is still obligated, then it should also find that the deferral is still in effect; and further, that in any event plaintiff lacks standing to bring the action. The wage deferral agreement is included in its entirety among the papers submitted in support of the city’s motion.
Preliminarily, the city moves also to have this action "transferred out of Small Claims Part and into the Civil Court itself’ because "although plaintiff’s claim falls within the Small Claims Part jurisdictional limit, the complexity of the action” claims the city, "renders it inappropriate for the informal and simplified procedure employed by the Small Claims Part”. However, when the city filed a jury demand, the action was automatically transferred to the regular part of the civil court. The filing of the jury demand did not change the small claims character of the action. (De Nicola v Pallas, 82 Misc 2d 156.) And, this court’s ability to deal with the acknowledged complexities of this action (all issues of law) is to no extent hampered by the action continuing to retain its small claims character. Accordingly, this portion of the city’s motion is denied as unjustified and unnecessary. The action shall continue to retain its small claims character and remain in the regular part of the civil court.
The issue whether the deferral terminated or still exists is as vexing as it is complex. Section 3 of article I of the deferral agreement provides that "in case there is any uncertainty as to whether there is an actual conflict or inconsistency” with respect to provisions of the agreement "any determination with regard to the matter shall be based upon the spirit and purpose of this agreement.” That spirit and purpose was clearly to help the city out of its fiscal crisis.
In section 1 of article II, the agreement states that the wage increases "shall be deferred for a period of one year.” Then, in section 2 of article II, the agreement states that the deferred increases "shall be paid” at the time provided for in article III and in accordance with sections 4, 5 and 6 of that article. Section 1 of article III provides that "By June 30, 1978, the *359 employer will seek to repay the deferred increases referred to in Article II.” The afore-mentioned sections 2 to 6 of article III contain conditions to payment which stated generally bind the city to pay the deferred increases by June 30, 1978, provided (a) that the city’s budget was balanced, (b) that the city was back again in the public securities market, and (c) that funds for payment were available in the employer deferral liability account. The city contends that these conditions to payment were not met by June 30, 1978, and as a result the city had no further liability for payment after June 30, 1978. Then, it goes a step further and contends that “assuming arguendo that the City’s obligation continued past that date, the conditions for payment still have not been met.” In that event, it urges this court to adopt the conclusions of an arbitration/impasse panel, rendered on July 20, 1978, in Matter of Coalition Unions (Office of Collective Bargaining, Docket No. A-743-78; 1-141-78). The coalition was a group of over 50 municipal unions representing more than 200,000 employees. The coalition and the city submitted to binding arbitration before the arbitration/impasse panel the issue whether the wage deferral agreement between the city and those unions (said but not shown by the city to be identical to the one involved in this action) imposed upon the city the obligation to make payment for deferred wages to a date beyond June 30, 1978. Plaintiff’s union was not a party to the proceeding. The panel concluded that the deferral agreement was ambiguous as to the date of termination. After resorting to parol evidence and reforming their wage deferral agreement, the panel made an award based upon its authority both as an arbitration panel interpreting the original wage deferral agreement and as an impasse panel with the right to fashion a new contract provision to be included in a new economic agreement. The award put off the time when the city would be first obligated to make the deferred payments to not sooner than July 1, 1982, provided that the city is back in the public securities market and the city has a budget that is balanced; and further, that if the aforesaid conditions are not met for payment in the fiscal year 1982-1983, then the obligation for payment shall continue thereafter until the stated conditions are met.
It is thus clear that the city seeks to impose upon this court an interpretation that the wage deferral was intended to be long-range rather than short-range. Yet, everything about the wage deferral agreement is short-range in intent as well as *360 specification. All of the specific time references are short-range, i.e., deferment for one year and payment by June 30, 1978; and, nowhere is there anything specifically extending the deferral to a date beyond June 30, 1978. A deferral for one year would have terminated the deferral on August 31, 1976, exactly one year after the effective date of the wage deferral agreement — a date coinciding exactly with the latest date on which the city was bound reciprocally not to lay off employees affected by the wage deferral agreement. Besides, what possible consideration would be forthcoming from the city during a period of indefinite continuance of the deferral? The consideration promised by the city in the deferral agreement was to not lay off affected employees between September 1, 1975 through August 31, 1976. How sensible or just is such a consideration in 1979 or 1982 or when plaintiff is in his grave? Indeed, "in his grave” is not an overdramatization. With this in mind, consider the incredible averments of Philip L. Toia, the city’s Deputy Mayor for Financial Management, in an affidavit of April 23, 1979, which is included among the city’s moving papers, and which is addressed to the conditions of payment in a deferral agreement in another action (Stone v City of New York, Index No. 493/78) presently pending in Kings County Civil Court. As to balancing the city’s budget, Mr. Toia states that it is not now balanced, was not balanced as of June 30, 1978, and appears certain not to be balanced in 1980. Yet, he admits for instance that the same financial statements which reflect the budget deficits for the city’s fiscal year ending June 30, 1978 actually reflect that "on the basis of its financial plan under special MAC legislation, the City has a surplus of $32 million.” As to the next condition, he states that the city has not re-entered the public securities market, and then adds cryptically, "within the meaning of thé wage deferral agreement.” Section 4.ii of article III of the wage deferral agreement does not attribute any special meaning to the re-entry of the city into the public securities market. All it states is: (provided) "the market for the sale of obligations of the City of New York is such that the City will be able to sell its obligations under the market terms and conditions then prevailing.” Has the city been able to sell its obligations under the market terms and conditions prevailing since June 30, 1978? Mr. Toia says "no” but he really means "yes”, with a qualiñcation which however does not appear in the wage deferral agreement. In paragraphs 4 and 5 of his affidavit he argues that this condition relates to the city’s *361 involvement in the long-term public securities market. Simultaneously, he admits that on January 30, 1979, the city "reentered the short-term public market.” Nothing in the wage deferral agreement requires that the obligations which the city would return to the public securities market to sell must only be long-term. And conversely, nothing in the agreement provides that if the city is offering only its short-term obligations for sale it has not returned to the public securities market.
As to the third condition, Mr. Toia states first that "no savings have been identified with respect to the Employer Deferral Liability Account for the 1977-78 fiscal year”; and, then he concludes, saying: "as the conditions for repayment have never been satisfied, there was never an obligation to credit funds to this account.” The conditions for repayment are thus solely under the control of a city which publicly proclaims that it never had an obligation to satisfy them. This last condition was so unconscionable that the arbitration/ impasse panel eliminated it entirely from the reformation of the wage deferral agreement before it.
What the city has done is to create an appearance of ambiguity as to time of termination of the deferral by torturing and misrepresenting as long-range the true contract meaning of the conditions. On the other hand, construing the same conditions short-range would create no ambiguity and would clearly be within the spirit and purpose of the wage deferral agreement.
Must the conclusions of the arbitration/impasse panel be binding upon this court? Let us see. First of all, they were rendered in an entirely different matter, in which the panel functioned not only as an arbitration panel interpreting the original wage deferral agreement but also as an impasse panel with the right to fashion a new contract provision for inclusion in a new economic agreement. The panel’s conclusions were reached after the panel reformed the original wage deferral agreement. It then went on to fashion an award which continued the deferral but also provided an adequate consideration for such continuance in the new economic agreement. While the agreement it passed upon has been said by the city to be identical to the one before this court, it has not been produced and is not part of the record and this court cannot hold that it is identical. Finally, neither plaintiff nor his union were parties to the arbitration/impasse proceeding. Accordingly, plaintiff’s objection that the panel’s conclusions *362 should not be binding upon him is sustained. On the other hand, the arguments advanced by the city in the arbitration/ impasse proceeding and the city’s request that this court adopt the conclusions of the arbitration/impasse shall be binding upon the city on this motion.
Nor, did the wage deferral agreement between the city and plaintiffs union contain anything expressly or impliedly indicating an intent to forfeit the right to eventual payment of the deferred wage increases. Section 3 of article II of the agreement, for instance, included the amount of the deferred wage increases for the purpose of computing retirement allowances;. and, section 6 of article III protected the right of eventual payment for affected employees "whether or not such employees are in employer service at the time of payment.”
The foregoing does much to expose the insincerity of the city’s position. This court takes judicial notice of current wage increases just voted for the highest level officials of the city administration without any preconditions to payment. (New York City Council Intro No. 713, eff July 1, 1979); and, of the following joint public statement of the City’s Mayor and Comptroller (New York City Daily News, Aug. 15, 1979): "The city finished fiscal 1979 with $200 million more than expected * * * The bulk of the extra cash flow resulted from a surplus of $117 million in the city’s contingency reserve which was never used.” Plaintiffs claim in this action is less than $1,000. The belated payment of this deferred wage increase for June 30, 1975 to June 30, 1976, can be paid out of whatever funds are available to pay the newly voted wage increases, or from newly found funds, whatever their origin, and through whatever accounting gimmickry they are derived. The city has not contended that it is now financially unable to pay plaintiffs deferred wage increase claims. If, therefore, it has the funds to pay plaintiffs claim, then the insistence upon compliance with the conditions is both pernicious and reprehensible.
If the deferral was intended to continue indefinitely beyond June 30, 1978 because the deferral agreement was ambiguous, as the arbitration/impasse found and as the city now asks this court to adopt, then the union did not adequately protect the rights of plaintiff and his coemployees. Admitting this as a probability, the city now cavalierly suggests that plaintiff has no standing to sue it directly under collective bargaining concepts, but, if plaintiff is aggrieved, that his sole remedy is a suit against the union for breach of *363 fiduciary relationship. (Chupka v Lorenz-Schneider Co., 12 NY2d 1, 6, app dsmd 372 US 227; Parker v Borock, 5 NY2d 156.)
The anomaly of this situation was expressed most poignantly, albeit crudely, by plaintiff when he exclaimed of his motion hearing that he is "getting a hosing”. Here is an employee who is entitled to a wage increase, but his employer, the City of New York, being in deep financial trouble, asks plaintiff’s union to promise on behalf of plaintiff and many thousands of his fellow employees to forbear the employees’ claims to the wage increases to help it out of its fiscal emergency. Plaintiff does not like his union, but, like it or not, he is required by the mystique of collective bargaining to abide by their representation of his rights in the matter. In doing this, the union does not consult him individually but enters into an agreement under which his wage increase is deferred. The agreement calls for a deferral for one year but then provides for payment of the wages at a time longer than the one year, namely "by June 30, 1978”. June 30, 1978 comes and goes. The city does nothing. His union does nothing. He therefore brings this action against the city. Now, the city, lifting up the veil of innocence, charges that, he either forfeited his right to the wage increases or that if he did not, his right is suspended indefinitely until the city (which clearly does not want to pay the obligation) complies with conditions which are completely within its own control. The reason for this the city tells him is that his own union entered into an ambiguous wage deferral agreement on his behalf, and he is therefore helpless to do anything about it unless he chooses to sue his union for breach of a fiduciary relationship. This, says plaintiff is a "hosing” — and who can disagree with him?
However, subsequent to Parker v Borock (supra) the Supreme Court of the United States, in Vaca v Sipes (386 US 171) opened the door to direct suit by an employee beneficiary against the employer where the union breached the fiduciary relationship through conduct amounting to bad faith, arbitrariness or the processing of employee rights in a perfunctory manner. (See, also, Hines v Anchor Motor Frgt., 424 US 554; Jackson v Regional Tr. Serv., 54 AD2d 305, 308; Wingenbach v Mushroom Transp. Co., 51 AD2d 855; Matter of Union Free School Dist. No. 6 v New York State Div. of Human Rights, 43 AD2d 31, 35.) If, under the foregoing concepts, the union has entered into an ambiguous agreement which leaves this em *364 ployee’s wage increase claim suspended indefinitely and then fails to act on the employee’s behalf to resolve this impasse after a reasonable time has expired, then it is clear that the union has not sufficiently protected plaintiffs rights and plaintiff can therefore resort to the direct suit he has instituted here. Nor, is plaintiff barred from doing so by article X of the deferral agreement, which only binds the parties (the union and the city) to resort to arbitration instead of direct suit in a court of law. The limitations of article X relate to disputes under the underlying contract, and the application or interpretation of terms of the deferral agreement, and disputes arising out of actions taken under this agreement. The relief plaintiff seeks is not within the scope of that limitation. There is no term of the deferral agreement which plaintiff seeks to have interpreted in the instant action. And, plaintiff has no dispute under the underlying contract or arising out of actions taken under that agreement. In fact, his prime complaint is that no action has been taken under the deferral agreement. Plaintiff has no complaint under and seeks no relief under the underlying agreement. Essentially plaintiff argues that he should be paid the deferred wage increases right now because the deferral agreement terminated on June 30, 1978; but, that if by construction it is interpreted that this agreement continued indefinitely beyond June 30, 1978, such continuance should be held to be only for a reasonable time — which has expired by now. Plaintiff argues that the deferral agreement is over and done with, and that the forbearance of his claim which the union imposed upon him has long since terminated. He now wants the money which was due him for wage increases on June 30, 1976 and would have been payable as of that date but for the wage deferral agreement. It is due him, he claims, under either the original collective bargaining agreement or under the wage deferral agreement.
A promise to defer a claim has been reflected in statutory and case law either as a promise to forbear or as an executory accord. To make forbearance a valid consideration requires a binding agreement to forbear for a definite time, or if the promise to forbear is to continue until the occurrence of a certain act, to forbear for a time reasonably long enough for the act to be done. (Strong v Sheffield, 144 NY2d 392; Trader’s Nat. Bank v Parker, 130 NY 415; Perkins v Proud, 62 Barb 420; Jamaica Tobacco & Sales Corp. v Siegel, 40 AD2d 686.) If the promisor prevents the occurrence of the condition he is *365 deemed to have waived it, and becomes liable to a duty of immediate performance without its occurrence. (Whitney, Contracts [4th ed], pp 239, 240; Batterbury v Vyse, 2 Hurlstone & Coliman 42 [Exch Rep].) This kind of promise has come to be the subject of litigation in cases where it has been embodied in a subsequent agreement (as in the case at bar) modifying or supplementing an earlier agreement under which the obligation to pay the claim was absolute and unconditional but for the promise to forbear or defer claim. Such a promise gives rise to what is called an executory accord, which has been defined as an agreement " 'to accept performance, in futuro, as future satisfaction of the old agreement or dispute.’ ” (Meidel Mfg. Corp. v Needham, 29 Misc 2d 267; cf. Rokeach Sales Corp. v Funaro, 16 Misc 2d 386, 388.) At common law, an executory accord not fully performed was unenforceable. However, since the enactment of section 33-a of the Personal Property Law (now General Obligations Law, § 15-501), an executory accord has been brought within the greater scope of a change or modification of an existing obligation and may be enforced provided it is in writing and signed by the party to be held (General Obligations Law, § 5-1103). If it remains unperformed, the promisee may elect to sue on the accord or the original obligation. (Goldbard v Empire State Mut. Life Ins. Co., 5 AD2d 230, 235.) This is because it is assumed that one does not ordinarily surrender an existing obligation for a promise to perform in the future; but, if he does, he will finally surrender his old rights only if and when the new contract of accord has been performed. (See 6 Williston, Contracts [rev ed], § 1847; 6 Corbin, Contracts, §§ 1268, 1271, 1293.)
This court concludes that the deferral agreement no longer bars this claim, having run its course, and since more than a reasonable time has elapsed since it ran its course, this claim is now unconditional.
The duty of this court in a small claims action, as defined in section 1804 of the New York City Civil Court Act, is "to do substantial justice between the parties according to the rules of substantive law and shall not be bound by statutory provisions or rules of practice, procedure, pleading or evidence”, except as to statutes and communications not pertinent here. Responsive to that duty, this court concludes that to grant the city’s motion to dismiss on grounds that the complaint fails to state a cause of action would be to dispense substantial *366 injustice, which this court shall not do. In the interests of substantial justice, and as such relief which appears to this court to be just and proper, this court treats this motion as one for summary judgment, and denies the motion as to defendant but grants summary judgment to plaintiff for the principal amount of the previously deferred wage increase, plus interest from the date the wage increase was due and payable under the underlying collective bargaining agreement. The promise under the deferral agreement to forego interest, abated with the abatement of deferral agreement, itself. Accordingly, this claim shall be set down for an assessment of damages in this part of the civil court at 2 p.m. on October 22, 1979.